## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE PINEDA | : |
| | : |
| Plaintiff, | :    No. 04-CV-3359 |
| | : |
| v. | : |
| | : **JURY OF TWELVE DEMANDED** |
| FORD MOTOR COMPANY | : |
| Defendant | : |

## ORDER

**AND NOW** this _____ day of _____, 2006, upon

consideration of Defendant Ford Motor Company's Motion *In Limine* To Exclude the Testimony

of Craig Clauser, and any response thereto, it is hereby **ORDERED** that Ford Motor Company's

Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that based on the exclusion of the testimony of Craig

Clauser, Ford Motor Company's Motion for Summary Judgment is **GRANTED**.

BY THE COURT:

_____
Honorable Bruce W. Kauffman, USDJ

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSE PINEDA | : | |
| | : | |
| Plaintiff, | : | No. 04-CV-3359 |
| | : | |
| v. | : | |
| | : | **JURY OF TWELVE DEMANDED** |
| FORD MOTOR COMPANY | : | |
| Defendant | : | |

### ORDER

**AND NOW** this _____ day of _____, 2006, upon

consideration of Defendant Ford Motor Company's Motion *In Limine* for a Daubert Hearing on

the Admissibility of the Testimony of of Craig D. Clauser, P.E., and any response thereto, it is

hereby **ORDERED** that Ford Motor Company's Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that a Daubert Hearing is scheduled for the _____ day

of _____, 2006, at which time the parties may present evidence on whether Clauser's testimony

is admissible under the Federal Rules of Evidence 702 and 703.

BY THE COURT:

_____
Honorable Bruce W. Kauffman, USDJ

3

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSE PINEDA | : | |
| Plaintiff, | : | No. 04-CV-3359 |
| | : | |
| v. | : | |
| | : | **JURY OF TWELVE DEMANDED** |
| FORD MOTOR COMPANY | : | |
| Defendant | : | |

---

### DEFENDANT FORD MOTOR COMPANY'S MOTION TO EXCLUDE THE TESTIMONY OF CRAIG M. CLAUSER AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A <u>DAUBERT</u> HEARING

Defendant Ford Motor Company, by and through its attorneys, hereby moves to exclude the testimony of Plaintiff's expert, Craig D. Clauser, P.E., and moves for Summary Judgment based on the exclusion of Mr. Clauser's testimony. In the alternative, Ford hereby moves for a <u>Daubert</u> hearing on the admissibility of the testimony of Plaintiff's putative expert witness for causation, Craig D. Clauser, P.E. The bases for Defendant's Motion are set forth in the accompanying Memorandum of law, which is incorporated herein as if set forth in full.

Defendant requests oral argument

Respectfully submitted,

By: _____

C. Scott Toomey, Esquire
Tiffany M. Alexander, Esquire
CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.
Attorneys for Defendant,
Ford Motor Company

Date:   May 15, 2006

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOSE PINEDA | : | |
| | : | |
| Plaintiff, | : | No. 04-CV-3359 |
| | : | |
| v. | : | |
| | : | **JURY OF TWELVE DEMANDED** |
| FORD MOTOR COMPANY | : | |
| Defendant | : | |

**DEFENDANT FORD MOTOR COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF CRAIG CLAUSER, AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A <u>DAUBERT</u> HEARING**

### I.   <u>INTRODUCTION</u>

Plaintiff, Jose Pineda ("Mr. Pineda"), in this case claims that the design of the liftgate glass assembly in the 2002 Ford Explorer is defective and that the defect caused an injury to his leg when the glass broke while he was repairing the hinge in the course of his employment with Murphy Lincoln-Mercury. In support of that theory, Mr. Pineda produced the report of Craig D. Clauser, P.E. (Exh. A), a putative expert in metallurgical and materials engineering. Ford seeks to exclude Mr. Clauser's testimony because his opinions fall far below the threshold criteria for admissibility under Federal Rule of Evidence 702, as construed by the Court in <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993).

Typically, the preferred procedure for the Court to evaluate the admissibility of an expert's testimony is to conduct a pretrial <u>Daubert</u> hearing, pursuant to Federal Rule of Evidence 104. <u>See</u> <u>Padillas v. Stork-Gamco</u>, 186 F.3d 412 (3d Cir. 1999). Here, however, the Court may well find that the record is sufficiently developed for the Court to conclude that Mr.

Clauser's testimony is plainly lacking in scientific rigor, so speculative and unsupported, and so inconsistent with the evidence as to obviate the need for a hearing.

## II.      STATEMENT OF UNDISPUTED FACTS

### A.      THE ACCIDENT

At 11:30 a.m. on July 18, 2002, Mr. Pineda, a trained Ford technician working for Murphy Lincoln-Mercury in West Chester, Pennsylvania, began working on a 2002 Ford Explorer owned by Daniel Beck.   Mr. Pineda had worked on the car one week prior and ordered replacement liftgate ball stud brackets, liftgate cylinders, and the hinges between the liftgate and the glass. (Pineda Dep. at 75, Exh. "B" hereto).    That morning, he brought the car into his bay and first replaced the liftgate cylinders and ball-stud brackets, a repair he had performed at least two times before without incident. (Exh. B at 78).   He went to lunch, returned around 1:00 p.m. and proceeded to replace the hinges that connect the liftgate glass to liftgate.   (Exh. B at 81).

He first replaced the left side hinge.   He moved to the right side, and with the glass in place, installed the male end of the hinge on the glass assembly.   He placed the nut on the female end of the hinge, and as he finished tightening the nut against the body, he heard a click. (Exh B. at 81).   He closed his eyes and felt something hit his leg.   He stepped back, opened his eyes and saw his left calf had been cut.   There were no eyewitnesses to the accident.

On July 16, 2004, Mr. Pineda filed a products liability action against Ford, claiming that the liftgate glass and hinges were defective in design.

### B.      DESCRIPTION OF THE LIFTGATE GLASS DESIGN

The concept behind a cargo area liftgate does not vary from vehicle to vehicle or from manufacturer to manufacturer.   For the consumer, the ability to open the rear liftgate glass alone offers easy access to the cargo area without having to open the entire liftgate.   (Exh. C – 2002

Explorer Source Book, p. 14). The liftgate glass is held in place by two (2) hinges on the top of the glass that attach to the liftgate assembly. When the glass is open, it is supported by hydraulic cylinders, each of which attaches to the glass on either side by way of a ball stud and bracket. (Exh. D – 2002 Explorer/Mountaineer Service Manual at p. 501-11-45). The top hydraulic support connection is secured to the glass by use of a "beauty bolt," which is simply a plastic-topped bolt that is inserted through a pre-drilled hole in the glass and attaches to the ball stud bracket. (Exh. E. – Photograph of 2002 Mountaineer liftgate glass and beauty bolt).

The use of the beauty bolt and the hinge and ball stud bracket locations on the liftgate glass are typical of many manufacturers' designs, including the 2006 Nissan Pathfinder, the Jeep Grand Cherokee, Jeep Wrangler and Honda CRV. (Exh. F – Expert Report of Aaron J. Jones, P.E. at p. 2).

**C.      CRAIG D. CLAUSER, P.E.**

To prove his design defect claim at trial, Mr. Pineda retained Craig D. Clauser, P.E. as a defect and causation expert.

**1.      QUALIFICATIONS**

This is the first case in which Mr. Clauser has opined that a glass assembly was defectively or negligently designed. (Exh. G – Clauser Depo. at 93). Mr. Clauser's only experience with glass opinion testimony is in the context of an alleged installation error, which resulted in breakage of the glass. (Exh. G at 91-92). He has never had occasion other than this case, in which he opined that the glass in a vehicle was defective in it of itself. (Exh. G at 93).

Although he is a member of the Society of Automotive Engineers ("SAE") and the American Society of Mechanical Engineers, Mr. Clauser did not search for peer reviewed articles or publications to support or refute his opinion in this case. In fact, the only research Mr.

3

Clauser undertook to support his opinion in this, his first glass design defect case, was on the internet. (Exh. G at 175).   Mr. Clauser has authored no professional publication in the issue of glass, glass design, or ceramics. (Exh. A).

### 2.   MR. CLAUSER'S DESIGN DEFECT OPINION

#### a.   MR. CLAUSER'S REPORT

Mr. Clauser issued a report dated September 30, 2005.  (Exh. A).   In it, he concludes that the 2002 Ford Explorer liftgate glass broke when Mr. Pineda was installing the glass hinge because it was "only marginally able to resist fracture in its intended service and the pertinent manual and bulletins lacked adequate instructions and warnings." (Exh. A at p. 5).   Mr. Clauser criticizes Ford for taking "advantage of the strength of the tempered glass and used the glass as a load-bearing element in the vehicle design." (Exh. A at p. 3).   Specifically, he is critical of the size of the contact area for the ball-stud bracket, the distance between the attachment points of the support cylinders to the hinge axis, and the holes in the glass at the bracket attachment points. (Id.).

Relying solely on Mr. Pineda's account of the accident, Mr. Clauser opines that Mr. Pineda was repairing the vehicle according to Ford's recommended procedures; however, the stress placed on the liftgate glass by the design of the hinges and support cylinders exceeded the tolerance of the glass itself, resulting in the glass breaking and causing the Mr. Pineda's injuries.

#### b.   MR. CLAUSER'S DEPOSITION

Mr. Clauser was deposed on March 31, 2006, and testified that although his report mentioned criticism of the use of tempered glass and rear window appliqué, he is not actually critical of those items, or the glass support components themselves.  According to Mr. Clauser, the individual hinges and support cylinders are not in any way defective, but rather he opines it is

4

the location of the attachment points of the cylinders and the amount and/or direction of force applied to the glass, which render the system as a whole, defective.[1]  Mr. Clauser explained his opinion as follows:

> Q:    My question is: What part of the glass design was defective. If it wasn't the fact that it was tempered glass and it wasn't the location of the glass, what part of the glass itself made it defective in your opinion?
>
> A:    The way it was supported by the air springs.
>
> Q:    On what do you base that opinion, what facts?
>
> A:    The behavior of the liftgate in service.
>
> Q:    What does that mean?
>
> A:    The number of warranty claims, the number of reports of broken glass.

(Exh. G at 123-125)

In Mr. Clauser's opinion, the reason the attachment of the air springs caused the glass to design to be defective is that it required a "higher force to be input to the liftgate by the spring and as a result, by the hinges." (Exh. G at 127).   He did not attempt to quantify the force actually applied on the glass in the subject vehicle, even though he admitted he could have done so:

> Q:    Can you quantify the force that's applied when you're opening the liftgate of a 2002 Ford Explorer, such as the subject vehicle?
>
> A:    I could.

---

[1] Q:    Is it your opinion that the glass alone installed in the rear liftgate of the 2002 Explorer is defective?
A:    Yes. It's a marginal design. The design of the glass and its attachments is marginal. A poor design is what caused the failure.
Q:    Are you critical of the use of tempered glass in that liftgate on the 2002 Explorer?
A:    Not the fact that it was tempered, no.
Q:    Are you critical of the size of the glass in the 2002 Explorer liftgate in this case?
A:    The size of it contributed to the failure.
Q:    Too big or too small?
A:    Too big. Or the fact that it is big is what contributed.
(Exh. G at 123-125)

Q:    Did you in this case?

A:    I have not.

Q:    Isn't that important to know before offering an opinion that the force is too much to determine what the force is?

A:    Well, relatively speaking, yes.

(Exh. G. at. 127-128)

Instead of calculating the actual force applied on the subject liftgate design, Mr. Clauser simply assumed that the force applied to the glass in the 2002 Explorer was higher than that of his proposed alternative design - the 2003 Explorer.[2]   His assumption is based on an apparent decrease in liftgate warranty claim reports between the 2002 and 2003 model Explorers.   The actual design of these two model years; however, differs in several ways, not all of which were considered by Mr. Clauser.   For example, the 2003 Explorer liftgate is supported by the same cylinders and hinges, except the distance between the cylinder attachment points is slightly longer than that of the 2002 and the direction of the force applied to the glass when the glass is closed is away from the glass.   His assumption that the stresses have been reduced by the relocation of the cylinder brackets in the 2003 model is just that – an assumption.   He did not quantify the forces exerted in either design, nor does he know what, if any, differences there are in glass size, dimension or tolerance.

---

3    Q: You believe that Ford should have implemented the 2003 changes to the location and size of the cylinder bracket in the 2002 model, is that correct?
A: Yes.
Q:  And that the change in location and size and some attachment points sufficiently reduced the stress of those components on the glass?
A: Yes.
Q: In your opinion, is the 2003 design that we've been talking about a safe design?
A: It appears to be.
(Exh. G at  172).

### 3.   MR. CLAUSER'S OPINION ON CAUSATION

Mr. Clauser acknowledged that in addition to the stresses the cylinders put on the glass, Mr. Pineda himself applied some degree of stress while he was performing the repair.   Mr. Pineda replaced the air cylinders first, and had just finished installing the liftgate hinges when the glass broke.   According to Mr. Clauser it was a combination of those stresses that caused the glass to break:

> A:   The system of attachment of the glass, the geometry, just causes the stresses to go up and down based on the configuration of the design. And when he was tightening that last hinge onto the steel, he pulled on the glass enough to – so that the forces that he was imposing, or the stresses that he was adding to it plus the stresses that were already in it, caused it to fracture.
>
> Q:   So he pulled on the glass and it caused it to fracture?
>
> A:   Right.

(Exh. G. at 142-143)

According to Mr. Pineda, right before the glass fractured, he was tightening the last bolt on the right hinge attaching the glass to the liftgate assembly.   He had already installed the left hinge completely and positioned the glass.   Though he did not quantify the amount of stress Mr. Pineda applied to the glass as opposed to the cylinders themselves, Mr. Clauser did determine that, given the description of the failure, the stress applied to the glass when it broke was in a lateral direction as opposed to fore and aft. (Id. at 152).   Therefore, according to Mr. Clauser, there was not perfect alignment of the glass when Mr. Pineda attached the right side hinge.

Though Mr. Clauser did not attempt to quantify or estimate the stresses applied by the cylinders, the hinges, or the Mr. Pineda's input during the repair, he testified that the cylinders alone, which were installed already and exerting an undefined stress on the glass during the replacement of the hinges, were not the cause of the break.   In his opinion, it was the

combination of the cylinders and the final hinge that changed the stresses to the level which ultimately exceeded the tolerance of the glass. (Id. at 167-8). [3]

### 4.   TESTING

Mr. Clauser did not perform any objective or subjective testing in this case. (Exh. G. at 174). He performed no experiments, no stress analysis, and no statistical review or analysis. (Id.). In fact, even after he completed an internet search and was unable to find any peer-reviewed studies or articles concerning the alleged defect of the liftgate glass support design, Mr. Clauser still failed to undertake any testing or studies of his own. (Id. at 175).   Mr. Clauser's entire opinion in this case is based on his review of warranty claims lists produced by Ford applicable to the 2002 Explorer liftgate glass and the opinions of unidentified individuals who posted comments on an independent website blog called "Blue Oval News.com." (Id. at 173-175).

The crux of his opinion is that the design of the liftgate glass was inadequate in that it allowed excessive stresses to be applied to the glass by one or more components. (Exh. G. at 126-127).  This is the first case in which Mr. Clauser has offered such an opinion.  Despite that, Mr. Clauser did not attempt to measure the stresses exerted upon the glass by the air cylinders in any condition (either open or closed) on either the 2002 Explorer or his proposed alternative design, the re-designed 2002 and 2003 Explorer liftgate. (Exh. G at 131).  He is aware that the direction of force is different between the 2002 and 2003 models, but he cannot say if that change in direction reduces the force applied to the glass at all. (Id. at 132).

According to Mr. Clauser, it was not only the undetermined, undefined stress the cylinders exerted on the glass that caused the glass to break, it was a combination of the

---

[3] "The stresses that broke the glass were a combination of what the struts put into the glass and the correction of the hinge misalignment that the final tightening of the hinge nut created." (Id. at 160, l. 14-18).

cylinders, hinges and Mr. Pineda's own undetermined lateral and linear inputs. In addition to not knowing the actual stress exerted by the cylinders, Mr. Clauser also failed to perform any objective tests or measurements to isolate the other elements in the combination of stresses which he believes led to the glass breaking in this case.[4] As Mr. Clauser explained:

> Q:   [W]ith the combination, can you determine, based on what you've reviewed for this case, which one in that combination was the causative factor of the glass breaking?

> A:   Well, the straw that broke the camel's back was the attachment of the hinge because the strut stresses didn't change at that point

> Q:   [H]ow do you know without quantifying the strut input or Mr. Pineda's input which caused the fracture of the glass here?

> A:   All I know it was a combination of the two. I can't quantify the contributions percentage-wise.

> Q:   You haven't done any tests to determine what the stress of the struts or hinges are on this glass, correct?

> A:   That's correct.

> Q:   You haven't reviewed any studies of what the stresses might have been measured to be by someone else at another time, correct?

> A:   Correct.

> Q:   What about other manufacturers' models; have you reviewed other manufacturers' design criteria to determine what the stresses of ball stud bracket and/or hinges are on those manufacturers tailgate glasses?

> A:   I have not.

(Exh. G at 167-169).

---

[4] Ford's expert Aaron Jones, P.E. did quantify the stresses exerted by the cylinders on the 2002 and 2003 liftgate glass and found that that the force in the subject vehicle is approximately 60 lbs per cylinder, while the re-designed attachment points and cylinder location exerted 84 lbs per cylinder. (Exh. F at p. 2).

Furthermore, Mr. Clauser did not determine the difference in mass, dimension or forces between the 2002 and 2003 Explorer, his proposed alternative design. (Exh. G. at 131-132). Therefore, even though he believes the 2002 is defective because it required a higher force to be input to the cylinders and hinges, Mr. Clauser has no information or basis to support this assumption. (Id. at 127).

As it relates to the repair procedures contained in the Ford Service Manual, Mr. Clauser claims that Ford should have set forth a specific order by which the hinges should be removed and reinstalled.    Mr. Clauser did not attempt to observe, perform or duplicate the repair procedures used by Mr. Pineda; however, and is not able to opine with any certainty that a different procedure would have made a difference in this case. (Id. at 121).   In fact, he testified he did nothing to substantiate his "other procedures" opinion except "look at the physical configuration of the liftgate glass and the tailgate." (Id. at 136).

## III.   ARGUMENT

Opinion testimony is generally disfavored at trial.  See, e.g., Hon. Charles R. Richey, Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence in Civil and Criminal Jury Trials, 154 F.R.D. 537, 542 (July 1994) ("Historically, both lay and 'expert' opinion evidence were viewed with skepticism by the courts. . . .  Mere opinions were considered unreliable bases for testimony.").   Given this general aversion, expert opinion testimony must meet strict requirements before it is allowed at trial and is given the court's imprimatur of being the testimony of an "expert."

### A.    CLAUSER IS NOT QUALIFIED TO PROVIDE EXPERT TESTIMONY

On November 18, 2003, the Third Circuit issued an opinion addressing the requirements for admitting expert testimony.  Calhoun v. Yamaha Motor Corp., 351 F.3d 316 (3d Cir. Nov.

18, 2003). The court explained that "[w]e have addressed the requirements of Fed. R. Evid. 702, focusing on the 'trilogy of restrictions on expert testimony: qualification, reliability and fit.' Qualification requires 'that the witness possess specialized expertise.'" Id. at 321 (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

With respect to qualifications, the court stated "[w]hile background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." Id. at 322. Moreover, the court explained "[a]n expert may be generally qualified but may lack qualifications to testify outside his area of expertise." Id.

The Seventh Circuit has addressed the court's gatekeeping role in assessing the qualifications of a proffered expert as follows:

> The Federal Rules of Evidence have, it is true, liberalized the standards for qualifying expert witnesses. . . . It is enough, to be qualified as an expert and thus entitled to give opinion testimony, that one has specialized knowledge that would assist the trier of fact. But the consequence of this liberality is not, or at least should not be, a free-for-all. The elimination of formal barriers to expert testimony has merely shifted to the trial judge the responsibility for keeping "junk science" out of the courtroom. It is a responsibility to be taken seriously. If the judge is not persuaded that a so-called expert has genuine knowledge that can be genuinely helpful to the jury, he should not let him testify.

Wilson v. City of Chicago, 6 F.3d 1233, 1238-39 (7th Cir. 1993) (citations omitted).

In Calhoun, a young girl was killed while riding a jet ski. Her parents brought an action against Yamaha alleging a defect with the design of the jet ski's acceleration mechanism. Calhoun, 350 F.3d 316 at 318. Plaintiffs proffered Albert Bruton to testify that Yamaha's accelerating system was not as safe as other alternative designs. Id. at 323. Bruton had sixteen years experience operating jet skis, and had conducted "aquatic related accident" investigations. Id. He also had some experience designing warning signs for public use.

The trial court restricted Bruton's testimony.  He was prohibited from opining "as to which jet skis, and particularly which accelerating mechanisms, were safer because the District Court found his 'ranges of experiences' did not give him the expertise or knowledge to make this determination." Id.  In affirming the trial court's evidentiary ruling, the Third Circuit explained:

> But as noted, Bruton had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or their accelerating mechanisms.  Bruton had neither the general background nor the specific knowledge to support his proffered testimony that the "squeeze finger throttle" was less safe than other designs.

Id.

The same reasoning is directly applicable here.  Mr. Clauser has never provided expert testimony in a glass design case such as this. Though he is arguably qualified in the field of mechanical and/or materials engineering, he is out of his area of expertise when discussing a glass design cases such as this.   Thus, as the Calhoun court noted, "[w]hile background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions."

Mr. Clauser has not provided any scientific, statistical, or other evidence to support his evaluation of the liftgate glass design in the 2002 Explorer or the component parts attached thereto, nor has he even made an attempt to search for such materials thorough his professional associations.  As in Calhoun, Mr. Clauser simply does not have "the general background nor the specific knowledge to support his proffered testimony" that the liftgate design in the 2002 Explorer is defectively designed.

### B.    CLAUSER'S TESTIMONY SHOULD BE PRECLUDED UNDER RULES 702

Even if this Court finds that Mr. Clauser's marginal qualifications sufficient under the broad standard of FED. R. EVID. 702, which it should not, Mr. Clauser's proffered testimony should be excluded because it is inherently unreliable under Rules 702 and 703.

### 1.    EXPERT OPINION TESTIMONY MUST BE DERIVED FROM A RELIABLE METHODOLOGY AND MUST "FIT" THE FACTS OF THE CASE

As a condition for admissibility, Federal Rule of Evidence 702 requires proffered expert testimony to embody "scientific, technical, or other specialized knowledge," as well as "assist" the trier of fact."    The Court in <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), held that this language required that proffered expert testimony be: (1) derived from a reliable methodology; and (2) "fit" the issues to be decided at trial.   The Court held that that inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." <u>Id</u>. at 592-93 (footnotes omitted).

Rule 702 was recently amended to make explicit what the Court in <u>Daubert</u> held was implicit under the prior version:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

On the reliability prong, the Court in <u>Daubert</u> identified the following factors that it believed would be helpful in making that determination:

> [1]    [W]hether it [the theory or technique] can be and has been tested. . . .

[2]    whether the theory or technique has been subjected to peer review and publication. . . .

[3]    the known or potential rate of error . .

[4]    the existence and maintenance of standards controlling the technique's operation. . . . [and]

[5]    "general acceptance" [of the methodology within the relevant scientific community] can yet have a bearing on the inquiry.

Daubert, 509 U.S. 579.

The Court emphasized that its list of factors was not exhaustive and that no single factor by itself was determinative. Instead, the Court emphasized that the analysis is a "flexible one," id. at 594, and that "[m]any factors will bear on the inquiry . . . ." Id. at 593. As a result, courts have identified a number of other factors that are relevant to the analysis. See, e.g., Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) ("Some other factors which this and other courts have considered in the Daubert analysis are reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)."); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994) (identifying four additional factors); FED. R. EVID. 702 advisory committee's note (identifying five additional factors).

The Court revisited these issues in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and reaffirmed the proposition that the analysis under Rule 702 and Daubert is a flexible one depending on the nature of the proffered testimony and the issues at hand. The Court further held that the analytical framework outlined in Daubert applies to all types of proffered expert testimony, and not simply "scientific" testimony.

The Court in Daubert also held that Rule 702 requires proffered expert testimony to "fit" the facts of the case. "'Fit' is not always obvious, and scientific validity for one purpose is not

necessarily scientific validity for other, unrelated purposes." Daubert, 509 U.S. at 591.   To illustrate, the Court gave the following example:

> The study of the phases of the moon . . . may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.   However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

509 U.S. at 591.

Rule 702 was recently amended to require that an expert's opinions be based on "sufficient facts or data."   FED. R. EVID. 702(1).   This amendment merely states the obvious — baseless and unsupported opinions are not helpful to the trier of fact and are therefore inadmissible.   General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

Also critical in the district court's analysis is Rule 703, which focuses on the data underlying the expert's opinion.   When a trial judge analyzes whether an expert's data is of a type "reasonably relied on" by experts in the field, as Rule 703 requires, the court should assess whether there are good grounds to rely on this data to draw conclusion reached by the expert:

> If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting in that sate must be excluded.   The key inquiry is reasonable reliance and that inquiry dictates that the trial judge must conduct an independent evaluation into reasonableness. Rule 703's reliability standard is similar to Rule 702's reliability requirement, i.e., there must be good grounds on which to find the data reliable.

In re TMI Litig., 193 F.3d 613, 697 (3d Cir. 1999) (internal quotations omitted).

Thus, an expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.   Tyger Constr. Co. v. Pensacola Constr. Co., 29

F.3d 137, 142 (4th Cir. 1994).  Indeed, it is an abuse of discretion to admit expert testimony

which is based on assumptions lacking any factual foundation in the record.  <u>Stecyk v. Ball</u>

<u>Helicopter Textron</u>, 295 F.3d 408, 414 (3d Cir. 2002).

## 2.     A COURT'S GATEKEEPING DUTY IS NOT DISCRETIONARY

A district court's decision to admit or exclude proffered expert testimony is given

deference on appeal under the abuse-of-discretion standard.  <u>General Elec. Co. v. Joiner</u>, 522

U.S. 136, 143 (1997) ("the question of admissibility of expert testimony . . . is reviewable under

the abuse of discretion standard.").  However, a District Court has no discretion on whether to

perform its gatekeeping function and that obligation is mandatory.  <u>Id.</u> at 148 (Breyer, J.,

concurring) ("neither the difficulty of the task nor any comparative lack of expertise can excuse

the judge from exercising the 'gatekeeping' duties that the Federal Rules impose . . . .  To the

contrary, when law and science intersect, those duties often must be exercised with care.");

<u>Kumho Tire</u>, 526 U.S. at 158-59 (Scalia, J., concurring) (while the district courts have discretion

in choosing the manner of testing the admissibility of expert testimony, "it is not discretion to

perform that function inadequately.").

This requirement is in place because "scientific proof may in some instances assume a

posture of mystic infallibility in the eyes of a jury of laymen . . . ."  <u>United States v. Addison</u>,

498 F.2d 741, 744 (D.C. Cir. 1974).  As a result, "there is the danger that the trial judge or jury

will ascribe a degree of certainty to the testimony of the expert which may not be deserved.'"

<u>Commonwealth v. Topa</u>, 369 A.2d 1277, 1317 (Pa. 1977); <u>see also</u> Peter W. Huber, <u>Junk Science</u>

<u>in the Courtroom</u>, FORBES at 68 (July 8, 1991) ("The law extends equal dignity to the opinions of

charlatans and Nobel Prize winners with only a lay jury to distinguish between the two.").  And

as the Eleventh Circuit observed, a lay jury is more likely than a trial judge "to be awestruck by the expert's mystique." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999).

### 3.   THE UTILITY OF A DAUBERT HEARING

It is true that a Daubert hearing can be an efficient procedure for the court to carry out the gatekeeping function, especially when the record is not well developed. Padillas v. Stork-Gamco, 186 F.3d 412 (3d Cir. 1999).  But where the record is well developed, where depositions have been taken and expert reports exchanged, the court may properly exercise its discretion to require nothing more. Oddi, 234 F.3d at 155 (party not entitled to *in limine* hearing before district court can reject an expert's testimony).   Ford submits that a ruling precluding the testimony of Mr. Anderson can be made on the record in this case as set forth below.[5]

#### a.   CLAUSER'S TESTIMONY IS INADMISSIBLE

Reviewing Mr. Clauser's testimony in light of Rules 702 and 703, as well as Daubert and it progeny, it is clear that the Court should keep the evidentiary gate locked tightly.

Mr. Clauser's opinion and testimony fail to satisfy any one of the Daubert factors.  Mr. Clauser has no methodology, and instead relies solely on subjective complaints contained in warranty repair records and internet blogs.  Mr. Clauser is well aware of the concept of "failure analysis" according to his testimony, yet he failed to apply it here.[6]  Considerations of a testable

---

[5] In the alternative, Ford requests a Daubert hearing to assess the admissibility of Mr. Clauser's testimony. See MANUAL FOR COMPLEX LITIGATION 3D 123-24 (Fed. Jud. Ctr. 1995) ("Pretrial rulings are also advisable with respect to proffered expert testimony that may be pivotal. The court may rule on the basis of written submission, but an evidentiary hearing under Fed. R. Evid. 104(a) may be necessary to determine whether the evidence is admissible under Rules 702 and 703.").

[6] Q: Can you explain failure analysis? What is the process?
A: Basically looking at something that's broken and figuring out why it broke with whatever is available, actual broken hardware if it's available, the history, looking at the design, drawings, exemplars, and the history of what was happening to it at the time, the loads, the environment, and so on. Gathering all that information you form a hypothesis on what happened, test it, mentally or by actually running tests, and come to a conclusion. (Exh. G. at p. 61).

hypothesis, peer review, rate of error, standards controlling the methodology, general acceptance, and reliability of methodology have no application to Mr. Clauser's analysis in this case. Instead, Mr. Clauser's analysis is based entirely on his unfounded assumptions of the amount of stress exerted on the glass by several different components and Mr. Pineda – without any testing or means to support it.

For instance, the warranty claim reports, which are the sole basis for Mr. Clauser's opinion that the 2002 is defective and the 2003 is not (because there were fewer incidents reported), give little or no detail as to the circumstances of each repair. (Warranty Claim report attached as Exh. "H" hereto).   Clauser admitted that the claim reports were not limited to the glass support system alone, but rather encompassed the entire liftgate. (Exh. G. at 18-19).   He claims they list "numerous" incidents of glass shattering, yet he could not say how many of the claims he reviewed were similar to Mr. Pineda's incident.   He did not observe either the 2002 or 2003 design in service, compare them to other vehicles in the field, or gather performance data on those vehicles.

In direct contradiction of his report, Mr. Clauser testified that he believed there was a "combination" of stresses that resulted in the glass breaking as Mr. Pineda was tightening the final hinge bolt.   The first was the linear stress of the cylinder on the glass, which he did not quantify.   The second was the load Mr. Pineda put on the glass when he tightened the last hinge bolt, load in a lateral direction caused by Mr. Pineda pulling on the glass, which brought the stress up at some point to a "critical level" and it shattered. (Exh. G. at p. 140 and 143).   He did not quantify either load, yet he opines that it is the design alone which must have resulted in the fracture.

The gaps in Mr. Clauser's chain of reasoning suggest that his opinion lacks the scientific rigor and objective support required to distinguish admissible scientific opinion from inadmissible speculation. Calhoun at 322. ("the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief.").

Finally, Mr. Clauser has not relied on any materials to support his opinion other than his own subjective beliefs, internet blog postings, and Mr. Pineda's recollection of the accident. Mr. Clauser relies on the postings on blueovalnews.com, yet he testified that he does not know:

- Who wrote the bloggings;

- Whether they are engineers or consumers;

- What, if any, qualifications they have to offer their opinions.

(Exh. G at 174)

As demonstrated by his testimony, Mr. Clauser failed to apply any reliable or scientific methodology in arriving as his opinion that the design of the 2002 Explorer liftgate glass is defective:

> Q:   Is there any objective testing that you've performed in this case to come to your conclusion that the 2002 model was overstressed as designed?
>
> A:   The performance reviews based on the warranty information.
>
> Q:   No experiments?
>
> A:   No.
>
> Q:   No stress analysis?
>
> A:   Nothing that we haven't discussed.
>
> Q:   No statistical review or analysis?

A:      Right.

Q:      No review of other peer reviewed studies?

A:      Peer review – I'm not aware of peer reviewed studies of this problem. I haven't seen any.

Q:      Have you looked for them?

A:      I've done internet searches for them. I have not seen any.

Q:      [S]o in your investigation of whether this design is defective on the 2002, you were unable to find any studies that had already examined the issue?

A:      That's correct.

Q:      And you undertook no additional study of your own?

A:      Correct.

(Exh. G at 174-175).

Had Mr. Clauser chosen to employ some sort of scientific analysis to support his opinion, there were several options available to him. He could have, as Ford's expert Aaron Jones did, actually measured the amount of force exerted on the glass by each cylinder in the 2002 design and his proposed alternative design, the 2003.  Mr. Clauser did not.

In order to determine what effect, if any, the change in positioning of the cylinders between the 2002 and 2003 had on the direction and distribution of stress on the glass, Mr. Clauser could have performed a computer simulated fine analysis and/or free body diagramming. (Dennis Schaefer Dep at 56, attached as Exh. "I" hereto).  He did not conduct any analysis to measure the forced exerted on the glass and he did not account for the differenced in design between the 2002 and 2003 model year Explorers.

In order to determine what the tolerance of the glass itself was, before stressed, Mr. Clauser could have performed a statistical analysis. (Exh. G at 138).  He did not.  In fact, he said

it was unnecessary in this case to determine what the tolerance of the glass would have been since there was a "history of failure to go on", presumably referring again to the warranty claim record.  When asked, he testified:

> Q: In your position as an expert in this case, isn't it important to you in determining whether or not the design of this glass was adequate or proper, to determine what the tolerance was as designed?
>
> A: That would be very interesting. . .

(Exh. G at 139).

Accordingly, his opinion is inadmissible under Rule 702, as construed by <u>Daubert</u> and <u>Kumho Tire</u>.  His opinion is also inadmissible under Rule 703 because it is not based on the type of things that other experts in the field rely on.  Without his opinion, there is no evidence to support a finding that the liftgate glass was defectively designed and, hence, judgment is appropriate in Ford's favor as a matter of law.  <u>See e.g.</u>, <u>Dhillon v. Crown Controls Corp.</u>, 269 F.3d 865 (7th Cir. 2001) (affirming exclusion of expert testimony and the entry of summary judgment in defendant's favor).

### C.   EXPERT EVIDENCE IS REQUIRED TO ESTABLISH A PRIMA FACIE CASE THAT A PRODUCT IS DEFECTIVE

In this case, Mr. Pineda is alleging a design defect theory of liability. The Pennsylvania Supreme Court has held that in design defect cases, "[t]he jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use." <u>Azzarello v. Black Bros. Co.</u>, 391 A.2d 1020, 1027 (Pa.1978); <u>Marino v. Maytag Corp.</u>, 2005 WL 2403638,*3 (WD. Pa. Sept. 29, 2005).   In this case, in order to prove the design of the 2002 Explorer liftgate is defective - given the engineering, environmental and human factors issues related to such a claim

– Mr. Pineda must produce admissible expert testimony to make out a prima facie case for the jury.

Pennsylvania law provides that "[e]xpert testimony is required when an issue is presented which is beyond the knowledge or experience of average laymen." <u>Commonwealth v. Young</u>, 692 A.2d 1112, 1115 (Pa. Super. 1997). If the party bearing the burden of proof on an issue requiring expert testimony fails to present such testimony, the party fails to establish a genuine issue of material fact on that issue. <u>See</u>, e.g., <u>Electron Energy Corp. v. Short</u>, 597 A.2d 175, 180 (Pa. Super. 1991) (no issue of fact presented on a certain element of damages because no expert testimony was presented on it and it was an issue "beyond the knowledge of the ordinary layperson."), <u>aff'd mem.</u>, 618 A.2d 395 (Pa. 1993).

As it relates to highly technological systems such as vehicle and engineering design, Third Circuit courts have held that that an expert opinion or analysis is a prerequisite to proof of a defective product. <u>Koplove v. Ford Motor Co.</u>, 795 F.2d 15 (3d Cir.1986), involved allegations of carburetor defect on a 1982 Ford Escort. The Third Circuit, affirming summary judgment in favor of Ford held, "Plaintiffs . . . failed to submit expert analysis to support their theory of the accident. In the circumstances of this case, it is probably impossible for the plaintiffs to prove a causal connection between this accident and any "generic defects" that may exist in 1982 Escorts. Clearly, however, a rational jury could not find the defendant liable without some expert analysis of the available information which implicated it." <u>Id.</u> at 17-18.

In <u>Hodge v. Caterpillar, Inc.</u>, a forklift defect case, the Plaintiff failed to produce an expert report or any competent evidence to prove his defect claims against Caterpillar. <u>Id.</u> 1992 WL 98415, *2 (ED. Pa. 1992). In granting Caterpillar's summary judgment motion, Judge Reed relied on the Third Circuit's reasoning in <u>Koplove</u> and held, "Plaintiff's inability to obtain and

serve an expert report in accordance with the scheduling order renders him unable to sustain his burden of proof and unable to prove that the lift truck was defective."   Judge Reed noted, "Plaintiff has had three attorneys and his last attorney would not pursue the case because he could not obtain an expert opinion on liability. There is no reason to prolong the Court's consideration of this case. For all the foregoing reasons and in the interests of fairness and judicial economy, I will enter summary judgment in favor of Caterpillar." Id.

Here, because Mr. Pineda has failed to produce an admissible expert opinion or factual evidence as to Ford, he cannot establish the two essential elements of his products liability claim: product defect and proximate cause.  Without such evidence, Mr. Pineda's product liability claim against Ford must fail, as a matter of law. See Hodge v. Caterpillar Inc.; Oddi v. Ford Motor Co., 234 F.3d 136, 159 (3d. Cir. 2000); Koplove v. Ford Motor Co., 795 F.2d 15, 17-18 (3d. Cir. 1986) (district court properly granted summary judgment for defendant when plaintiff failed to produce required expert evidence).

## IV.   CONCLUSION

For all the above-stated reasons, Ford respectfully requests this Court exclude the testimony of Craig Clauser and grant summary judgment in favor of Ford.  In the alternative, Ford respectfully requests this Court hold a Daubert hearing to determine the admissibility of plaintiff's expert, Craig D. Clauser, P.E.

Respectfully submitted,

CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.

By: _____

C. Scott Toomey, Esquire
Tiffany M. Alexander, Esquire
Attorneys for Defendant,

23

## CERTIFICATE OF SERVICE

Tiffany M. Alexander, Esquire, hereby certifies that a true and correct copy of the

**Defendant Ford Motor Company's Motion to Exclude the Testimony of Craig M.**

**Clauser and Motion For Summary Judgment or, in the Alternative, For a Daubert**

**Hearing** has been served via email and Federal Express Overnight Mail as follows:


Andrew P. Motel, Esquire
LAW OFFICES OF ANDREW P. MOTEL, LLC
330 North High Street
West Chester, Pa. 19380
*Attorney for Plaintiff*


By: _____
Tiffany M. Alexander, Esquire


Date: May 15, 2006